The next case on the docket is People of the State of Illinois v. Howard Neal Weidner. Cause number 5-13-0022. And Mr. Vivarino, you're up first. Thank you. May it please the Court, Howard Weidner respectfully requests this Court to review the ruling of the admissibility of chemical test evidence under the statutory provision of 625 ILCS 5-11-001.2. That provision incorporates by reference administrative code provisions promulgated by the Department of State Police. The specific administrative code provision at issue here is 1286.320 paren c close paren that provides that the blood sample should be collected using proper medical technique. After an evidentiary hearing, the trial court ruled that the opinion of this Court in People v. Sprin is on point and dispositive. Accordingly, the trial judge allowed the results of a blood alcohol concentration analysis to be admitted in evidence at trial. Howard Weidner respectfully requests this Court to consider the opinion of the Illinois Supreme Court in People v. Emmerich and the cases that follow it on appeal. Howard Weidner raised two issues in his motion limiting. One had to do with the lack of any regulation defining this phrase proper medical technique. In the absence of the Illinois State Police providing a definition of that phrase, it left the trial court in the position to speculate concerning what is proper medical technique. But the focus of the evidentiary hearing was whether or not the blood was collected using proper medical technique. And the fact that there was an evidentiary hearing regarding that matter is significant. As your honors are aware, in this Court's Sprin opinion, the Court in reaching its conclusion stated that according to the reasoning in Morris, or accordingly the reasoning in Morris, leads to the conclusion that the trial court's ruling allowing the results of the blood and urine samples to be admitted in evidence was proper. And as you recall, Sprin was arrested at a time when 1286.320C said a disinfectant that does not contain alcohol shall be used to cleanse the skin. And then before trial in Sprin, that regulation was amended to say the blood should be collected using proper medical technique. And Sprin on appeal argued that application of that amendment was the imposition of non-constitutional ex post facto law. And this Court said no and relied upon Morris. However, in Morris, in addition to addressing the ex post facto issue, the Court in its conclusion said the fact that the regulation has been amended does not mean that defendant cannot challenge the blood draw and attempt to keep the test results out. There has yet to be any kind of factual hearing as to whether the use of a disinfectant that contains any amount of alcohol is an improper medical technique to draw blood under the amended regulation. The thrust of your argument is that the State did not use a proper medical technique because there was alcohol in the swab used in the blood draw. Yes. What's the evidence that there was alcohol in the swab? The only evidence that exists is evidence that was obtained as a result of some testing, in this case directed by the Court as a result of an agreement of the parties, and that is the incident upon which this charge is premised occurred in July of 2011. An Illinois State Police DUI kit was used in the blood collection process. The disinfectant in that kit was used to cleanse the skin of Howard White. That disinfectant, including the packaging, was discarded. However, fortunately, an assistant State's DUI kit from that very hospital in July of 2011. The parties, again, at the direction of the Court and by agreement, had the disinfectant from that DUI kit analyzed by the Illinois State Police Division of Forensic Sciences and the result of that analysis was that there was alcohol in that disinfectant. Six one thousandths? Yes, .006 grams per deciliter. When did the evidence come in that that would actually, in certain cases, reduce the rate, the amount of blood alcohol as opposed to increase it? Well, John Westing, who is the training coordinator for the Illinois State Police Division of Forensic Sciences, testified during the evidentiary hearing on this motion, and his analysis was if you have a quantity of whiskey and you have a quantity of beer, and the quantities are the same, and the concentration of alcohol in the whiskey is higher than the concentration of alcohol in the beer, and you mix the two together, the resulting concentration is going to be less than what it was in the whiskey and more than what it was in the beer. But in that case, we know what the quantities are, we know what the concentrations are. So, for example, if we have a .05 concentration in the beer and a .20 concentration or a .25 concentration in the whiskey, we mix them together, we may wind up with a substance now that has a .15 concentration or something like that. So it's lower than the whiskey was, but greater than the beer. What Mr. Westing doesn't know, and acknowledged, is he doesn't know how the alcohol gets introduced into these DUI kit disinfectants because the contract between the Illinois State Police or the Department of Central Management Services of the State of Illinois and the provider of the DUI kits has a specification, and the specification is that the disinfectant that's incorporated in these kits is to be alcohol-free. So what he knows is he tested some prior to discovering back in 2007 that there in fact was alcohol in the disinfectant. Again, the standard said a disinfectant that does not contain alcohol should be used. Then the discovery occurs that there's alcohol in the disinfectant, so then the provision is amended to say the blood should be drawn using proper medical technique. But no definition concerning proper medical technique. So one of the questions at this evidentiary hearing was is use of a disinfectant that contains any amount of alcohol, even .006 proper medical technique? John Westing was not asked that question by the prosecution and didn't answer that question. Michael Evans, a toxicologist who formerly was the equivalent in Indiana of the director of the Illinois State Police Division of Forensic Sciences in Illinois, in fact trained a person who became the director in Illinois, testified that use of a disinfectant that contains any amount of alcohol in the disinfectant should be used. And he based that... Which gets back to my question, and I don't want to beat this too much, but is the only evidence that there was any alcohol in the swab used on Mr. Westing? I don't know. I don't know. I don't know. I don't know. Whose burden is it? It's the prosecution's burden to prove that there was compliance with its standard. Its standard is collect the blood using proper medical technique. The only evidence of proper medical technique is the NCCLS standard, which is a nationally recognized clinical laboratory standard, by which not only is the use of a disinfectant that does not contain alcohol should be used. And it says why, which is again important, because as you may recall in the Sprint opinion, there was some discussion about BAIR, B-A-I-R, and that is, is this disinfectant required when promulgated by the state police something only for the well-being of the patient? Well, John Westing, again at an evidentiary hearing in this case, which was not present in these other cases, said, well, one of the reasons we have the contract specification that the disinfectant in the DUI kit shall not contain alcohol is so that we don't have to engage in analysis of this issue, and that is whether some amount of that seems to be the standard that's addressed by the courts. The Morris Court says could have an effect. The Illinois Supreme Court opinion in People v. Vannuti possibly could have effected. It's not an in fact did effect. It's this question of could it have an effect, and in fact the NCCLS standard that was presented, says regarding specimen collection, the blood collection procedure for forensic and alcohol determinations must be conducted so that no doubt exists as to the authenticity and validity of the specimen. Now, remember 11501.2 says in order to be considered valid that there has to be compliance with these standards. The NCCLS standard also says that for forensic alcohol determinations, the blood collection procedure must be conducted so that no doubt exists as to the authenticity and validity, and after stating that the disinfectant used for cleansing the venipuncture site should not contain alcohol or other volatile organic substances, there's reference to studies that have revealed that blood specimens can be significantly contaminated if alcohol-containing sponges are used to cover the venipuncture site at the time when the needle is withdrawn. Are you saying that the state police have incorporated within their rules the NCCLS standard? What is being presented to the court here is the Illinois State Police amend the standard to say proper medical technique should be used. There's no reference to the NCCLS standard, though. There's no reference to a definition of proper medical technique. The state police have not seen fit to incorporate the standard into their rules, right? I can't say that that's right. All I can say is Mike Levins testified that the Illinois State Police Division of Forensic Sciences is audited by the same standards that hospitals are audited and accredited by, and that standard for But the police knew that the kits that they were ordering contained alcohol swabs and promulgated a revision to its rule that said that, gave out a notice, correct? Yes. So if the state police believe that the proper medical standard is to use such a swab, how would you respond to that? Well, there's a big if there. What did the Illinois State Police know? And did the Illinois State Police know that proper medical technique means use a disinfectant that doesn't contain alcohol? We don't have the benefit of knowing what the Illinois State Police knew because in the notice that was sent out when they amended it to use that term of art, proper medical technique, they didn't say what they meant by proper medical technique. Now, they easily could have said, if they wanted to continue using those disinfectants, they could have said a disinfectant that contains less than .007 grams per deciliter of alcohol shall be used to cleanse the skin. There would have been an easy way to resolve this issue. Now, why is it not resolved? Maybe there were lots of Illinois State Police DUI kits on the shelves of hospitals throughout the state of Illinois and for economic or other reasons, it made more sense not to have to jettison a number of Illinois State Police DUI disinfectants. I don't know that. But what we do know is when a hospital in Clay County collects blood for alcohol concentration analysis at its own hospital, the hospital's policy is use a disinfectant that doesn't contain alcohol. So what do they do? They use baby shampoo. So from an economic standpoint, the Illinois State Police could have just directed its officers, when you're at the hospital and you're going to use one of these DUI kits, just have the hospital personnel use the one in the kit because it contains alcohol. We don't know the answers to all those questions. What we do know is that the only evidence of proper medical technique from expert witnesses are Trudy Lambert, the lead laboratory tech, who signed off on the policy for the Clay County Hospital, which is why we have Exhibit 1, incorporated the NCCLS standards and the policy says, do not cleanse the sample draw site with alcohol or other form of disinfectants. Use only aqueous disinfectants. And we know that Michael Evans testified that the standard that is used to audit hospitals and to determine alcohol concentration are audited by the NCCLS standards. And the NCCLS standard is, use a disinfectant that does not contain alcohol. So this state of the record is that the only expert testimony offered was offered by the defense. The state offered no expert testimony as to what proper medical technique is. I expect the state will say that a paramedic, Wayne Woods, testified. Now, Wayne Woods collected the blood specimens from Howard Widener. Wayne Woods says that for medical blood draws, and I'm paraphrasing here, but the hospital is going to be drawing blood to test the blood in its own laboratory to determine alcohol concentration. Don't use an alcohol-based disinfectant. Then what he says is if it's a DUI case and a law enforcement officer requests blood to be collected, his training was to use the DUI kit and to follow the instructions in the DUI kit. He was never asked, is that your training, using the DUI kit as proper medical technique? Now, whether this court considers the paramedic to be an expert witness or not, that's for this court to analyze. But the persons who are familiar with the policy of the hospital, in fact, the person who approved the policy said, as policy is, that when you're testing for alcohol, you use a disinfectant that doesn't contain alcohol, and the toxicologist, Michael Evans, testified, when you're testing for alcohol, you use a disinfectant that doesn't contain any alcohol, even .006. And he goes on to say the reason that we have, as scientists, these policies is to be able to provide reliability so that we don't have to engage in analysis of whether the presence of alcohol in the disinfectant could have or did affect the result. We have these policies so that we don't have to engage in that kind of analysis. And as your Honor has aptly pointed out here, Michael Evans also said, we don't know what amount of alcohol was in this, and we will never know. I'll give you a chance to rebuttal. Thank you. Mr. Daly. Thank you, your Honor. Thank you for your support. Good morning. A little bit of math to start out with. I hate to start an argument out that way. And this is, I'm going to admit right now, probably a gross oversimplification of a mathematical principle that would likely be applied in this case. But I think it's important to note that when the discussion was made about the beer and the whiskey and the mixture and all that, and then there's some discussion about whether there's some level of mystery about the concentration in the swab itself, the defendant's blood alcohol test was .151 grams per deciliter. Concentration in the tested swab was .006 of a gram per deciliter, which would mean that there would have to be 25 times that amount of concentration in the swab used in order to reach an equilibrium point of .151. Just for comparison purposes, .08, which would be the legal limit, would be 13 times the concentration. Now, I do caution this with a very huge asterisk because I'm not a physicist or a mathematician and there's certain factors that play into alcohol that's on a venipuncture site versus the volume of blood that's drawn in the mixture of the same. But I do think it's at least an interesting reference point to sort of float in the background when we decide and we don't know and the state can't prove something that was obviously inappropriately discarded after the test was completed, about what that measure of mystery would have to entail before we get to the point which every expert agrees, both Westing and the defendant's expert, would be the case. Because everyone agrees that .006 is a forensically insignificant amount of alcohol to affect the defendant's blood alcohol level, the measure that was tested in this case. But having said that, I think there needs to be some caution here that there not be a conflation of really kind of two principles that are at stake here. The admissibility of a test result under the department's standards, which is derived from a statutory requirement, and the impeachment of a result as it occurs at trial. The defendant stood here and made, I think, a very good cross-examination at trial of whether or not a trier of facts should believe or find some confidence in the result. That does not necessarily mean that the test is inadmissible. 11-501.2A1 sets out the standards for admission of test results in DUI cases. And the language of that statute is very clear about to what regulatory body or what bodies that decision or those standards are deferred to. There it says that they shall be performed according to state police standards. The director of the state police is authorized to approve satisfactory standards for testing, chemical testing in DUI cases, and they shall thus prescribe regulations necessary to implement the section. Now, I agree with the defendant on one point. There's not any real definition of what was a proper medical technique, unfortunately. However, I think that when we consider about what the state police would consider to be an appropriate medical technique, and not what the defendant's actually or anyone else thinks, because the court's been clear that this task of deciding the standards for chemical testing is delegated solely and exclusively to the province of the Illinois State Police and not to anyone else, to decide whether or not, when we look at the historical antecedent of the statute, what the state police knew and didn't know. And Justice Cates alluded to a large portion of what I'm about to say right now. In its original form, the statute, subsection C, there was language which stated that you cannot use a swab which contains alcohol. It was then determined, and Westing confirmed this because he said at the time that this regulation was amended that they tested a number of swabs. And I'm going to interrupt myself here real quick because this might be an interesting insertion, good insertion point for the question that you had, Justice Stewart. I'm not going to make a big deal about whether we do or don't know what was on the swab. I mean, I think that it's no more easy to say that there's no alcohol than there's to say there's 25 times the concentration of alcohol. I think that we could say, and I would at least admit, that it was agreed upon at the hearing that the state police's DUI kits contain venipuncture swabs whose manufacturer protocol allows for or has as part of it a trace amount of alcohol. And so I'm not going to contest on that point, but I do think that the contestation point does have to at least look at the fact that what was tested here and what Westing tested or what was claimed was tested at the time that the statute was amended in 2007. Now, when the statute was amended in 2007, the state police had come forward during the amendment process and admitted that, well, we've discovered that the swabs that are being used contain a trace amount of alcohol. Obviously, if the state police at that point had, in its view, determined that that trace amount of alcohol would not be one that would fall within the mandate of the state police specifically to ensure what would be considered to be reliable test results in blood draws, then it would have really no reason to withdraw that particular language and substitute it. But all courts have agreed that the state police specifically withdrew that and inserted proper medical technique with full knowledge of the fact that the manufacturer of the swabs that are being used tested this particular level, which Westing testified to as being a forensically insignificant amount. Now, the reductio defendant's argument here is essentially that, well, there's never going to be a valid, in almost every instance, a valid chemical draw where a DUI test kit is being used. In the very next section of the administrative code, the blood draw is required when available to use the contents of, and which were done in this case, a DUI test kit given by the state police, which contains, among other things, these swabs which contain a trace amount of ethanol. I think that when we look at what the specific question is in this case, the specific question is, did the state police promulgate a standard that, in its view, complied with what it considered to be a reliable procedure? Now, we could argue, and the defendant can argue, and the defendant can present an expert witness, and the defendant can wave all sorts of standards around and say, there's an attribute that says this, there's an attribute that you're allowing the swab to say this. These are all great arguments, but they don't answer the salient question that's in this appeal, and that is whether the state police standards were complied with in this case, and undoubtedly they were. Whether they're good or bad, or right or wrong, is not for this court to decide, or for me to decide, or for anyone to decide, but for the state police, because they're given that exclusive profit. Whether that standard is wrong is challenging. Now, I'm aware of this Morris decision that the defendant cites here, and he's correct in his relation of the language of it. The two points that I would make in response to that Morris decision are, number one, I don't think that it was an issue specifically put before the court about whether or not it could even get to whether that standard is right or wrong, or alternatively, the court also said it was never any evidence in that case about what .005, what effect that would ever have on the blood test result. We certainly have evidence of that. I don't necessarily want this court to take that further step to look at .005 and make qualitative decisions about the reliability or lack of reliability, because I think the answer to this appeal is far simpler. The answer is, when you look at the historical antecedents of this and what the state police knew, what the state police consciously knew, because it specifically stated that they knew that there was alcohol in the swabs. They, in fact, discarded any real import of it by saying that, well, it's always been there because we asked for the safety of the person rather than any sort of forensic value. The question for the court, the circuit court, the question for this court is whether the state police standards are complied with. Certainly, when the state police standards are not complied with, the test is rendered inadmissible, and we don't even get to these other secondary considerations, or I won't say secondary, but alternative considerations that could come up during traffic. The defendant's got a great argument, but we're not there, and we didn't get there in this case because of the stipulated venture. So the single and only issue for this case is whether those standards are complied with. They were. So, I mean, basically your argument is that if we look at the history of the state police's rulemaking, they implicitly decided that having a swab with a trace amount of alcohol is proper medical technique. Think about it this way. They took out a decision at the exact point where that language was removed. And we have testimony that that's because they discovered that all the kids had a trace amount of alcohol. Absolutely. And a decision was made, rightly or wrongly, that whatever alcohol was on there was not a forensically significant amount, but obviously there's an inconsistency that they recognize that if they're going to require swabs to be used on an alcohol and they're giving out police kits which contain swabs which contain alcohol, you're going to run into a whole world of problems. But that's the state police's singular objective and their duty as supplied by the legislature to make those types of decisions, rightly or wrongly. So, Your Honor, the test, the admissibility of the blood test results in this case were proper because they did comply with the state police standards. Issues that the defendant raises, and he does make a very logical argument, but those are not related to compliance with the department's standards, but to the broader question of whether or not a trifecta should go ahead and accept those standards as appropriate. That may come up in another case, but that's not relevant. Your Honor, is there any other questions? Let me just ask a question about the record. Yes, sir. If we got all this testimony about this is why it was changed this way and everything, it was Whetstein, the Illinois State Police guy, right? Correct. Was he just not asked whether, for his opinion as to whether or not trace amount of alcohol was a proper medical technique or how did we end up with only one side giving an opinion? Well, I think that there's sort of two things going on here. I think when you look at the testimony, I think the state's sort of focus was more upon the likely effect of the .005. Now, obviously, I don't know if you want to call it a harmless error or something like that, although I don't think there's an error. My argument sort of draws more upon case authority, which draws upon the history of the statute. And so again, it's kind of like a specific statutory interpretation type case that we have here. The state's position, I think, if I had to give an overarching answer to that would be that because the state police give you a test kit and the test kit was used and the defendant's correct at that point in the testimony by the paramedic, then the state police stand as a compliant. In that case, that satisfies the proper medical technique, which then leads into the argument I made here about the state police's qualitative and quantitative decision-making about whether that's an appropriate medical technique. But it sort of begs beggar's disbelief or belief that the state police would simultaneously promote and preclude the use of these floggings. And that's really what it comes down to in this case, from a statutory interpretation standpoint. Thank you, Your Honor. I appreciate your time. Thank you, Mr. Daly. Mr. Viverito, any rebuttal, sir? Yes, thank you. There isn't any testimony in this proceeding specifically about the reason for the amendment of the statute. John Wetstein didn't testify that it was amended from use a disinfectant that does not contain alcohol as a proper medical technique. That testimony does not exist in this case. So he doesn't specifically say that's why we made the amendment? Exactly. There was no testimony from him regarding the reason for the amendment. So, again, it's one of those things we will never know. It may be we're all assuming here that, well, gee, if in 2007 the State Police Division of Forensic Sciences found out that there's alcohol in these disinfectants, that they must have presumed that the same disinfectants would then be used after they amended the provision to say proper medical technique. That's speculation. What we do know from the testimony is in 2007 the contract that provided for these DUI kids had a provision in it that the disinfectant shall not contain alcohol. It was supposed to be alcohol free. We know that even after the amendment, the contract provision at the time of the incident in this case was also that the disinfectant should be alcohol free. So if you're going to look at the history of what the Illinois State Police has done here, they have been consistent that the disinfectant in the DUI kit shall be alcohol free. Now, if we're trying to shed some light on what's proper medical technique, according to the Illinois State Police, proper medical technique is to use a disinfectant during the blood collection process that does not contain alcohol. And John Wettstein testified that the reason the contract specifies the disinfectant should be alcohol free is so that we don't have to engage in this question about whether it had any effect. And I agree with counsel. That's not the question. The question is not, well, does it make any difference? It's not one of those, so what? The question is, was there compliance with the standard? And that's what People v. Emmerich says. It doesn't matter whether the fact that there wasn't an anticoagulant or preservative affected the reliability. There's an ordinary standard of admissibility where if in a reckless homicide case back in the time when Emmerich was decided, the ordinary standard of admissibility applies. Well, then that blood alcohol concentration can come in in the reckless homicide case. But when the statutory standard is, you shall comply with these provisions, and the evidence shall be admissible and valid only if you comply with the provisions. And if you don't comply with the provision, we never get to the so what question. So we're both focused on the same thing, and that is, was this blood collected using proper medical technique? And the only expert testimony concerning proper medical technique is use a disinfectant that doesn't contain alcohol, and that's consistent with the Illinois State Police standard. And in fact, the provision of the standard that counsel pulled this year regarding officers shall use DUI kits provided by the department if possible. If kits are not available, officers may submit two standard rain top vacuum tubes for an pursuant to generally accepted industry standards. Well, what's the generally accepted industry standard for the collection of blood? Use a disinfectant that doesn't contain alcohol. So I can't explain why when the amendment was made in 2007, somehow, someway, disinfectants got in DUI kits that contain alcohol. All we know is the Illinois State Police contracted for disinfectants that are to be alcohol free. The provision of their standards talk about generally accepted industry standards. We know what the generally accepted industry standard is with regard to use of disinfectants. They shall not contain alcohol. So for all those reasons, we're respectfully requesting the court to reverse the decision of the trial court in vacating the adjustment condition. All right. Thank you both for your excellent briefs and arguments. Interesting issue. We'll take this matter under advisement and issue a decision in due course.